Filed 6/12/15  Downtown Sunnyvale Residential v. Wells Fargo Bank CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DOWNTOWN SUNNYVALE RESIDENTIAL, LLC et al., | H039332 <br> (Santa Clara County <br> Super. Ct. No. 1-11-CV213485) |
| Plaintiffs, Cross-defendants, and Appellants, | |
| v. | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING, NO CHANGE IN JUDGMENT |
| WELLS FARGO BANK, N.A., | |
| Defendant, Cross-complainant and Appellant. | |

BY THE COURT:

It is ordered the opinion filed herein on May 19, 2015, be modified as follows:

On page 32, first line, after the paragraph ending with, "There is no evidence Wells Fargo restrained or chilled bidding," add the following paragraph:

"Downtown Sunnyvale relies on language in *Baron v. Colonial Mortgage Service Co.* (1980) 111 Cal.App.3d 316, 323-324, where the appellate court concluded that a beneficiary must use due diligence to ensure all reasonable efforts are made to secure the best possible or most reasonable price during a nonjudicial foreclosure sale.  Therefore, Downtown Sunnyvale argues that Wells Fargo was obliged to notify former bidders of the upcoming trustee's sale.  However, even if we were to accept this claim as true, Downtown Sunnyvale still fails to demonstrate it was prejudiced by Wells Fargo's alleged inaction."

On page 32, the first full paragraph, first sentence starting with, "More importantly, whether the bank's failure…" is modified to read:

"Whether the bank's failure to personally notify bidders from the receiver's sale about the trustee's sale contributed to the absence of bidders at the trustee's sale is purely speculative."

On page 35, first line, after the sentence, "At all times, there was only *one* action brought, and Wells Fargo did not seek to appropriate assets before exhausting the security first," add a footnote that reads:

"In a petition for rehearing, Downtown Sunnyvale asserts that this court glossed over the determinative issue of who had managerial authority over the borrowers. In part, Downtown Sunnyvale claims that if RREEF did not have managerial authority over the borrowers, then Wells Fargo effectively appropriated assets before the security in violation of section 726 when it accepted RREEF's settlement. However, this argument was not raised in Downtown Sunnyvale's opening brief. The only claim regarding section 726 brought by Downtown Sunnyvale was that the receiver's sale violated the security first principle. No argument was made about the managerial authority issue, except in Downtown Sunnyvale's reply brief. Points raised for the first time in a reply brief will ordinarily not be considered. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.) Furthermore, it does not appear that Downtown Sunnyvale argued these points below to the trial court, because there is no mention of the managerial authority issue's potential impact on Downtown Sunnyvale's section 726 claim in its opposition to the anti-SLAPP motion below. As a rule, "[p]oints not raised in the trial court will not be considered on appeal." (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486.) Therefore, we decline to express an opinion on the merits of Downtown Sunnyvale's arguments on this point."

2

On page 37, first full paragraph, after the sentence, "Additionally, it does not appear that SHP and Pau's offer of $185 million would have covered the full amount of the indebtedness owed, which Wells Fargo estimated at $189,418,440," add the following footnote:

"In its August 2011 letter to SHP and Pau, Wells Fargo wrote that it had updated the lender balance to reflect changes since August 5, 2011. It then clarified that if the amount of the balance, $189,418,440, was received by the bank, it would consider the loan repaid. Attached to this letter were two spreadsheets, one reflecting a loan balance of $189,418,440 and another reflecting a loan balance of $182,512,815. Since Wells Fargo's letter only referenced the $189,418,440 sum, we presume that the amount of the balance remaining at that time was $189,418,440, not $182,512,815."

There is no change in judgment. The petition for rehearing is denied.

Dated: _____           _____

                                                             Rushing, P.J.


_____
              Elia, J.

3

Filed 5/19/15  Downtown Sunnyvale Residential v. Wells Fargo Bank CA6 (unmodified version)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| DOWNTOWN SUNNYVALE RESIDENTIAL, LLC et al., <br><br>        Plaintiffs, Cross-defendants, and Appellants, <br><br>        v. <br><br> WELLS FARGO BANK, N.A., <br><br>        Defendant, Cross-complainant and Appellant. | H039332 <br> (Santa Clara County <br>  Super. Ct. No. 1-11-CV213485) |

In 2007, construction began on the Sunnyvale Town Center Project (Project), a large mixed-use redevelopment project located in Sunnyvale, California.  The project was financed in part by a construction loan provided by Wells Fargo Bank.[1]  Two years later, the borrowers defaulted on the loan.  The bank filed a complaint for judicial foreclosure and sought appointment of a receiver.  The subsequent proceedings related to the Project, including the bank's nonjudicial foreclosure sale and the trial court's discharge of the court-appointed receiver, became mired in litigation, resulting in several unpublished appellate opinions from this court.

---

[1] Wachovia issued the loan as the administrative agent for itself and Bank of America, N.A.  Wells Fargo Bank, N.A. is the successor by merger to Wachovia.  For clarity, when we discuss the administrative agent, we will refer to "Wells Fargo."

The appeal before us concerns Wells Fargo's alleged impairment of the trustee's sale where the Project was eventually sold. Several entities representing minority shareholders of the borrowers filed a complaint against Wells Fargo, claiming it had engaged in bid-chilling and had harmed their equitable right to redemption by increasing the amount of debt owed. Wells Fargo moved to strike the complaint under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[2] The trial court granted and denied the motion in part. It struck the first four causes of action and left intact the fifth cause of action for breach of contract. Downtown Sunnyvale has appealed the court's grant of the anti-SLAPP motion on the first four causes of action.[3] Wells Fargo has appealed the court's denial of its anti-SLAPP motion on the remaining cause of action.

Contrary to Downtown Sunnyvale's arguments, we conclude that all of its causes of action arise from protected activity under the anti-SLAPP statute, and it has not demonstrated a probability of prevailing on any of its claims. For the reasons set forth below, we reverse and remand the trial court's order. On remand, the trial court is directed to enter a new order granting Wells Fargo's anti-SLAPP motion in its entirety.

FACTUAL AND PROCEDURAL BACKGROUND

*The Project and Development*

A detailed summary of the facts regarding the development of the Project is contained in our prior opinions and need not be repeated again. (See *Downtown Sunnyvale Residential*, *LLC et al*. *v*. *Wachovia Bank National Association* (Nov. 14,

---

[2] "SLAPP" stands for " 'strategic lawsuit against public participation.' " (*Jarrow Formulas*, *Inc*. *v*. *LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1.) Further unspecified statutory references are to the Code of Civil Procedure.

[3] As explained in further detail below, there are multiple parties comprising the appellants in this appeal. For the sake of clarity, we will refer to the appellants as "Downtown Sunnyvale" when addressing their arguments on appeal. However, we will refer to the various entities in their individual capacity when necessary.

2

2013, H037419) [nonpub. opn.] [2013 Cal.App. unpub. LEXIS 7457] (*Downtown Sunnyvale I*); *Downtown Sunnyvale Residential*, *LLC v. Wells Fargo Bank*, *N.A.* (Jan. 20, 2015, H038572, H039024) [nonpub. opn.] [2015 Cal.App. unpub. LEXIS 357] (*Downtown Sunnyvale II*).) However, we briefly review the facts relevant to the issues raised in this current appeal.

Downtown Sunnyvale Mixed Use (DSMU) was the master developer of the Project and held legal title to the real property. In 2007, DSMU was formed as a joint venture between RREEF and SHP San Jose, LLC (SHP).[4] Downtown Sunnyvale Residential, LLC (DSR) is a wholly-owned subsidiary of DSMU. Together, DSMU and DSR secured a $108.8 million loan from Wells Fargo by a deed of trust dated August 29, 2007.[5] Pursuant to an agreement with DSMU, Peter Pau was the development manager for the project.

In 2009, the borrowers defaulted on the loan and Wells Fargo began judicial foreclosure proceedings. The bank also sought and obtained appointment of a receiver, L. Gerald Hunt (Hunt), as provided for in the deed of trust securing its loan.

*The Attempted Receiver's Sale and the First Anti-SLAPP Motion*

On October 12, 2010, Hunt obtained an order from the court allowing him to sell the Project free and clear of liens and encumbrances. He also contracted with a broker, Eastdil Secured, to assist in the marketing process. More than 165 potential buyers signed confidentiality agreements and were provided with an offering memorandum that

---

[4] SHP owns a 5 percent interest in DSMU. RREEF owns the remaining 95 percent interest in DSMU. RREEF is comprised of RREEF America REIT III Corp. MM, a Maryland corporation, and RREEF America REIT III Corp., MM TRS, a Maryland Corporation. We collectively refer to these entities as "RREEF."

[5] We collectively refer to DSMU and its subsidiary DSR as "the Borrowers" and refer to each entity in its individual capacity when necessary.

3

contained due diligence materials.  In April 2011, Hunt preliminarily accepted an offer made by Starwood Capital Group Global I, LLC (Starwood).

The following month, Downtown Sunnyvale filed an answer to Wells Fargo's complaint for judicial foreclosure and appointment of a receiver.  Downtown Sunnyvale also filed a cross-complaint seeking to stop the receiver's sale, arguing the procedure violated section 726.  The complaint alleged causes of action for declaratory relief, cancellation of instruments, fraudulent concealment, misrepresentation, interference with contract, and conspiracy.

On June 15, 2011, the trial court issued an order clarifying that the receiver's sale was premature, pending a final judgment or foreclosure decree.  The court also denied Hunt's motion to confirm the sale of the property to Starwood.

On August 11, 2011, Wells Fargo moved to strike Downtown Sunnyvale's claims against the bank under the anti-SLAPP statute.  The trial court granted the anti-SLAPP motion, and Downtown Sunnyvale appealed.  This anti-SLAPP motion was the subject of our unpublished decision in *Downtown Sunnyvale I*.  (*Downtown Sunnyvale I*, *supra*, H037419.)  On appeal, we affirmed the trial court's decision, concluding the gravamen of Downtown Sunnyvale's claims against Wells Fargo arose out of communications related to protected judicial proceedings and were therefore subject to the provisions of the anti-SLAPP statute.  (*Ibid*.)  We further concluded that Downtown Sunnyvale had not demonstrated a probability of prevailing on the merits of its claims.  (*Ibid*.)

*The Trustee's Sale and the Second Anti-SLAPP Motion*

With the receiver's sale stalled, Wells Fargo noticed a trustee sale of the Project through a nonjudicial foreclosure.  The notice of sale was recorded with the county recorder, and was published in several newspapers.  On August 17, 2011, Wells Fargo, the sole bidder at the trustee's sale, purchased the Project with a credit bid of the original loan amount.

4

On November 18, 2011, Downtown Sunnyvale filed a complaint seeking cancellation of the trustee's sale, which Wells Fargo moved to strike. The court granted Wells Fargo's motion with leave to amend.

Downtown Sunnyvale filed an amended complaint on April 23, 2012. Wells Fargo filed another motion to strike arguing the principles of res judicata precluded retrying any of the issues, which the court denied. Wells Fargo subsequently filed a second motion to strike under the anti-SLAPP statute, which Downtown Sunnyvale opposed.

On December 31, 2012, the trial court granted the motion to strike in part and denied it in part. The court struck four out of the five claims in the complaint, leaving only the claim for breach of the deed of trust. The trial court concluded the other claims arose from protected activity, namely, Wells Fargo's pursuit of judicial and nonjudicial foreclosure remedies. Downtown Sunnyvale appealed from the trial court's partial grant of the anti-SLAPP motion, and Wells Fargo appealed from the trial court's partial denial of the anti-SLAPP motion. This second anti-SLAPP motion is the subject of this present appeal.

### *The Receiver's Discharge*

On November 11, 2011, Hunt filed notice of his final account and requested approval of his fees, exoneration of bonds, and discharge of all claims against him and the receivership estate. Downtown Sunnyvale objected to his discharge. Overruling Downtown Sunnyvale's objections, the trial court discharged Hunt. Downtown Sunnyvale appealed, which resulted in the second unpublished opinion from this court, *Downtown Sunnyvale II*, *supra*, H038572, H039024. We affirmed the court's discharge of the receiver in *Downtown Sunnyvale II*.

5

DISCUSSION

Wells Fargo and Downtown Sunnyvale appeal from the trial court's partial grant and denial of the special motion to strike Downtown Sunnyvale's complaint seeking to cancel the trustee's sale. Downtown Sunnyvale argues that none of its causes of action arise out of protected activity, and even if they did, it sufficiently demonstrated a probability of prevailing on the merits of all its claims. Wells Fargo argues the trial court erred in denying its anti-SLAPP motion as to Downtown Sunnyvale's fifth cause of action for breach of contract.

1. **Preclusive Effect of** *Downtown Sunnyvale I*

First, we address Wells Fargo's argument that our decision in *Downtown Sunnyvale I*, the appeal following the first anti-SLAPP motion, has preclusive effects on this current appeal based on two separate but related doctrines: the doctrine of issue preclusion, or res judicata, and the doctrine of the law of the case.

"The applicable principle that bars relitigation is issue preclusion, also known as collateral estoppel. [¶] Issue preclusion prevents 'relitigation of issues argued and decided in prior proceedings.' [Citation.] The threshold requirements for issue preclusion are: (1) the issue is identical to that decided in the former proceeding, (2) the issue was actually litigated in the former proceeding, (3) the issue was necessarily decided in the former proceeding, (4) the decision in the former proceeding is final and on the merits, and (5) preclusion is sought against a person who was party or in privity with a party to the former proceeding. [Citation.] When those requirements are met, the propriety of preclusion depends upon whether application will further the public policies of 'preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation.' " (*Castillo v. City of Los Angeles* (2001) 92 Cal.App.4th 477, 481.)

" ' "The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal.' " [Citation.]' [Citation.] The law of the case may apply even where the appeal is from a decision short of a full trial, including a judgment on a demurrer, a nonsuit order or denial of an anti-SLAPP motion." (*Hotels Nevada*, *LLC v*. *L.A*. *Pacific Center*, *Inc*. (2012) 203 Cal.App.4th 336, 356.)

One primary difference between the doctrines of res judicata and law of the case is that law of the case applies only if the current action arises out of the same case as the earlier ruling. Our decision in *Downtown Sunnyvale I* followed after Wells Fargo filed its initial complaint for judicial foreclosure and appointment of a receiver. Downtown Sunnyvale subsequently filed a cross-complaint, which Wells Fargo moved to strike under the anti-SLAPP statute. The trial court granted the special motion to strike, and Downtown Sunnyvale appealed. We later affirmed the trial court's decision. This present appeal followed after the Project was sold at the trustee's sale. Below, these two cases were consolidated by the trial court. Therefore, they are one in the same, and prior decisions in the first case will be binding so long as the other elements of the doctrine of law of the case are met. Identical issues decided in *Downtown Sunnyvale I* would also have the same preclusive effect under the doctrine of collateral estoppel.

In order to determine whether any of the claims raised in this appeal were finally decided in *Downtown Sunnyvale I*, we must go through a step-by-step process. Duplicate claims raised in *Downtown Sunnyvale I* that are re-raised here would be bound by our prior decision. On the other hand, issues that were not decided in *Downtown Sunnyvale I* would not be bound by law of the case or collateral estoppel, as they would not have been finally decided on the merits.

7

With this in mind, we proceed to examine the arguments presented by the parties here, distinguishing those issues that have already been decided in the prior appeal.

2. **Overview of the Anti-SLAPP Statute and Standard of Review**

The anti-SLAPP statute provides a "procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055-1056.) Consequently, "the anti-SLAPP statute is to be construed broadly." (*Padres L.P. v. Henderson* (2003) 114 Cal.App.4th 495, 508.)

In evaluating an anti-SLAPP motion, the trial court must engage in a two-step process. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).) It first determines "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) A defendant meets this burden by demonstrating the plaintiff's action is premised on statements or conduct taken " 'in furtherance of the [defendant]'s right of petition or free speech under the United States [Constitution] or [the] California Constitution in connection with a public issue,' as defined in the [anti-SLAPP] statute. (§ 425.16, subd. (b)(1).)" (*Equilon*, *supra*, at p. 67.) If the defendant makes the requisite showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the claim. (*Ibid*.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute--i.e., that arises from protected speech or petitioning *and* lacks even minimal merit--is a SLAPP, subject to being stricken under the statute." (*Navellier*, *supra*, at p. 89.)

We review the trial court's ruling on an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) In so doing, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We do not make credibility determinations or compare the weight of the evidence presented below. Instead, we accept the opposing party's

evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) The court "should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

"A defendant who files a special motion to strike bears the initial burden of demonstrating that the challenged cause of action arises from protected activity." (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 669.) This requirement is not always easily met. (*Equilon, supra*, 29 Cal.4th at p. 66.) "A claim does not arise from constitutionally protected activity simply because it is triggered by such activity or is filed after it occurs." (*World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1568.) In deciding whether a cause of action "arises from" protected activity, "the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) An "act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech." (*Ibid.*) Courts must look to "the act underlying the cause of action, not the gist of the cause of action." (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1190.)

Under the " 'principal thrust or gravamen' test," even if a cause of action is based on allegations of both protected and unprotected activity, the anti-SLAPP statute may still apply. (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 319.) So long as the allegations of protected activity are not "only incidental to a cause of action based essentially on nonprotected activity," a cause of action is subject to section 425.16. (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188.)

9

A moving defendant satisfies his or her burden by showing that the conduct or statement forming the basis of the plaintiff's claim falls within one of the four categories of protected activity set forth under section 425.16, subdivision (e). (*Equilon*, *supra*, 29 Cal.4th at p. 66.) That provision states: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

By legislative mandate, the phrase "in connection with" is read broadly and the California Supreme Court has held "that '[j]ust as communications preparatory to or in anticipation of the bringing of an action or other official proceeding are within the protection of the litigation privilege . . . such statements are equally entitled to the benefits of section 425.16.' " (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115.) Furthermore, the negotiation and execution of settlement agreements relating to litigation are made " 'in connection' " with judicial proceedings and thus fall within the ambit of section 425.16. (*Navellier*, *supra*, 29 Cal.4th at p. 90.)

3. **Protected Activity under the Anti-SLAPP Law**

First, the parties disagree on whether the amended complaint seeking to cancel the trustee's sale arises from protected activity as set forth under the anti-SLAPP statute.

Wells Fargo argues the complaint arises from its activities in connection with a judicial proceeding, namely, the judicial foreclosure. We agree.

*First Cause of Action*: *Set Aside of the Trustee's Sale*

Downtown Sunnyvale's cause of action to set aside the trustee's sale alleges the sale was improper and must be set aside because: (1) Wells Fargo chilled bidding and failed to conduct a commercially reasonable sale by funding and participating in the development of the property during the course of the receivership and by paying off junior liens that would have been extinguished by a nonjudicial foreclosure sale, (2) Wells Fargo chilled bidding by failing to record a new notice of default before proceeding with the trustee's sale, which would have put the buyers who had expressed interest during the receiver sale process on notice that the Project would be sold at a public auction as required by law, (3) Wells Fargo chilled bidding by failing to cancel or rescind its prior contract with Starwood that was elicited during the receiver sale process, (4) Wells Fargo failed to proceed in a commercially reasonable manner because it did not correct the public record and inform potential bidders that the mode of sale had substantially changed, (5) Wells Fargo secretly carried on negotiations with Apple that resulted in a signing of a lease, which would have influenced bidder participation at the trustee's sale, (6) Wells Fargo interfered with the borrower's equity of redemption by piling on two years worth of improvement and development costs, (7) Wells Fargo interfered with the borrower's equity of redemption by violating section 726, and (8) Wells Fargo released the borrowers of the secured debt without any conditions precedent.

Based on the foregoing, it is clear that this cause of action alleges liability arising from a number of purportedly improper acts. When a complaint "presents a mixed cause of action that involves protected and nonprotected activities . . . the question presented is 'whether the gravamen of the cause of action targets protected activity. [Citation.] If liability is not based on protected activity, the cause of action does not target the

11

protected activity and is therefore not subject to the SLAPP statute. [Citations.]' (*Haight Ashbury Free Clinics*, *Inc*. *v*. *Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1550.) Stated differently, the question is whether the protected activity is merely an incidental part of the cause of action." (*City of Colton v*. *Singletary* (2012) 206 Cal.App.4th 751, 767.) This "reflect[s] the fundamental concept that a 'plaintiff cannot frustrate the purpose of the SLAPP statute through a pleading tactic of combining allegations of protected and nonprotected activity under the label of "one cause of action." ' " (*Comstock v*. *Aber* (2012) 212 Cal.App.4th 931, 946.)

Therefore, the determinative issue is whether any of these alleged acts are nonincidental, protected activity under the anti-SLAPP statute thereby transforming this first claim into a mixed cause of action.

Downtown Sunnyvale maintains that none of the conduct alleged in the complaint fall within the purview of the anti-SLAPP statute, because a trustee's sale is not entitled to protection under section 425.16. Downtown Sunnyvale relies on *Garretson v*. *Post* (2007) 156 Cal.App.4th 1508 (*Garretson*), but we find this reliance misplaced.

We discussed the applicability of *Garretson* in *Downtown Sunnyvale I*. We explained that *Garretson* involved the beneficiary of a deed of trust who initiated nonjudicial foreclosure proceedings against the plaintiff and was subsequently sued for, among other things, wrongful foreclosure. The *Garretson* court held the defendant beneficiary could not claim the protections of section 425.16 for her alleged wrongdoing because " 'nonjudicial foreclosure is a private, contractual proceeding, rather than an official governmental proceeding or action.' " (*Garretson*, *supra*, 156 Cal.App.4th at p. 1518, italics removed.) Here, unlike *Garretson*, Wells Fargo first brought an action for judicial foreclosure and, as part of a contemplated settlement of that official governmental proceeding, agreed to instead proceed by way of nonjudicial foreclosure.

12

Communications and acts related to the judicial foreclosure would necessarily be protected speech and petitioning activity under the anti-SLAPP statute.

Downtown Sunnyvale also relies on *Blackburn v. Brady* (2004) 116 Cal.App.4th 670 (*Blackburn*), which we find inapposite. The plaintiff in *Blackburn* sued the defendant for partition, accounting, and fraud. The defendant moved to strike the complaint under the anti-SLAPP statute, alleging the complaint arose out of written or oral statements made during a sheriff's auction that resulted in the property's sale. (*Id*. at p. 676.) The defendant claimed the sheriff's auction was an official proceeding under the law and was therefore protected activity under section 425.16, subdivision (e)(1). The trial court denied the anti-SLAPP motion, and the appellate court affirmed, concluding that "[t]he ministerial event of a sheriff's sale or auction simply does not concern an issue under review or determine some disputed matter as contemplated under the anti-SLAPP law. Rather, as already noted, it consists merely of offers and the acceptance of the highest bid made according to certain requirements without any determination based on the exercise of one's free speech or petition rights. As such, it concerns a business dealing or transaction . . . , and not the exercise of protected activity under section 425.16." (*Blackburn*, *supra*, at p. 677.)

The flaw in Downtown Sunnyvale's argument is that unlike *Blackburn*, its complaint does not merely assert, as the basis for liability, errors with the bank's actions that relate solely to the private, nongovernmental transactions comprising the trustee's sale.[6] The complaint also targets protected speech. For example, the complaint alleges

---

[6] If it had, we may have agreed with Downtown Sunnyvale that this cause of action did not "arise" out of the bank's protected petitioning activity. The fact that Wells Fargo's act of filing the complaint for judicial foreclosure initiated the litigation culminating in the trustee's sale would be of no moment. "That a cause of action arguably may have been triggered by protected activity does not entail that it is one arising from such." (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78.)

liability based on Wells Fargo's improper inflation of the debt through funding developments and improvements to the Project during the course of the court-appointed receivership. The complaint also alleges Wells Fargo is liable because it failed to cancel the contract with Starwood after the receiver's sale fell apart, and because it released the borrower's debt prior to the trustee's sale.

We concluded in *Downtown Sunnyvale I* that the settlement agreements with RREEF were related to the ongoing judicial foreclosure litigation, and were, therefore, clearly made "in connection" with a judicial proceeding. (*Downtown Sunnyvale I*, *supra*, at pp. *20-21.) We additionally determined that Wells Fargo's negotiation and execution of the settlement agreement, the receiver's motion for authorization to market and sell the property, and Wells Fargo's allegedly fraudulent concealment and misrepresentations regarding the sale were all connected to or made in anticipation to a judicial proceeding. (*Id*. at pp. *24-25.) We are bound by our prior determination that these acts are protected activity pursuant to the anti-SLAPP statute.

Furthermore, the complaint alleges Wells Fargo incurred the sanctions of section 726 when it ignored two *Wozab* warnings and continued to pursue its "invalid course of conduct" by selling the Project. The *Wozab* letter written on behalf of SHP and Pau allege that Wells Fargo improperly sought appointment of a receiver with powers beyond that of a rents and profits receiver and improperly sought to sell the property through a receiver's sale. The appointment of the receiver and the receiver's sale were part of the negotiations and settlement related to the original complaint for judicial foreclosure filed by Wells Fargo. Although the matter was ultimately resolved through a nonjudicial foreclosure sale, the statements and agreements relating to that process were still made in connection with a judicial proceeding. (See *Downtown Sunnyvale I*, *supra*, at p. *14.) Again, we conclusively decided this exact issue in *Downtown Sunnyvale I* and therefore

14

follow our prior decision, which held that these acts are protected speech and petitioning activity.

Similarly, Wells Fargo's communications with the court-appointed receiver, which form the basis of the allegation that Wells Fargo improperly inflated the debt by funding and participating in the receiver's development of the Project, are also statements made in connection with an issue under consideration by a court in a judicial proceeding. (See *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153 [statements to court-appointed liquidator in pending liquidation proceeding were made in connection with an issue under consideration by a court in a judicial proceeding under § 425.16, subd. (e)].)

Downtown Sunnyvale's argument that many appellate cases hold that lawsuits centered on private business relationships are not subject to the anti-SLAPP statute is without merit. The cases cited to in support of this proposition, such as *Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790 (*Wang*) and *Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207 (*Graffiti*), are not dispositive. In *Wang*, the court determined that although the underlying litigation involved requests to governmental authorities for land use planning items, these requests were merely incidental to the overall gravamen of the complaint, which challenged the "manner in which the parties privately dealt with one another, on both contractual and tort theories." (*Wang*, *supra*, at p. 809.) Similarly, in *Graffiti*, the appellate court concluded that although the protected speech at issue "may be of evidentiary value in establishing that [the defendant] violated the law, liability is not based on the [protected] communications themselves." (*Graffiti*, *supra*, at p. 1224.)

The principles applied in *Wang* and *Graffiti* are the same employed by us here. *Wang* and *Graffiti* merely reiterate that in order for a cause of action to be subject to a special motion to strike, it must be established that the gravamen of the complaint targets

15

protected speech and petitioning activity that are not merely incidental to the complaint. In this particular case, the protected speech and activity at issue, including the negotiations and settlement agreements regarding the judicial foreclosure action and the communications with the receiver, are not simply a collateral matter. These acts formed the basis of liability.

Lastly, we reject Downtown Sunnyvale's argument that the complaint only targets Wells Fargo's inactions, not actions, and inaction is not protected activity under the anti-SLAPP statute. Much of the protected speech and petitioning activity alleged in the complaint are *acts*, not just a failure to act, including Wells Fargo's decision to release the Borrower's debt prior to the trustee's sale, the trustee's sale itself, the negotiations related to the judicial foreclosure, and Wells Fargo's communications with the receiver regarding the development and improvement of the Project.[7]

Simply put, Downtown Sunnyvale's attempt to focus only on the allegations in its complaint that target *unprotected* speech and petitioning activity is unavailing. The first cause of action alleges liability based on both protected and unprotected speech under section 425.16. (See *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1287.) Therefore, it is a mixed cause of action and must be stricken unless Downtown Sunnyvale can demonstrate a probability of prevailing on the merits.

*Second, Third and Fourth Causes of Action*

Downtown Sunnyvale's second cause of action for cancellation of the trustee's deed, third cause of action for slander of title, and fourth cause of action for an accounting are all derived from the same activity alleged in its first cause of action to set aside the trustee's sale. Since we conclude the first cause of action arises, at least in part,

---

[7] Additionally, it is "well established that the constitutional right of free speech includes the right not to speak." (*Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, 947.)

16

from protected petitioning activity, the same conclusion applies to these causes of action. Accordingly, they too must be stricken unless Downtown Sunnyvale can demonstrate a probability of prevailing on the merits. (*City of Colton v. Singletary*, *supra*, 206 Cal.App.4th at p. 768.)

*Fifth Cause of Action*: *Breach of Contract*

The final cause of action in the amended complaint is for breach of contract. Unlike the first four causes of action, the trial court concluded this cause of action did not arise from protected activity.

The principal allegations in this cause of action are that Wells Fargo breached the deed of trust by (1) artificially inflating the debt by causing unauthorized development and improvement charges, (2) precluding competitive bidding at the foreclosure sale by failing to record a notice of default following the court's order stopping the receiver's sale, (3) obstructing and rejecting Downtown Sunnyvale's attempt at reinstatement or redemption.

We find the trial court erred by concluding this cause of action did not arise from protected activity. Like Downtown Sunnyvale's first four causes of action, this fifth cause of action for breach of contract alleges liability based in part on protected speech and petitioning activity under the anti-SLAPP law. In fact, this cause of action incorporated by reference all of the prior allegations in the complaint, including the protected activity described in the previous section of our opinion.

Additionally, even if we were to consider this claim separately, Downtown Sunnyvale alleges Wells Fargo breached the deed of trust by authorizing the receiver's expenditure on developments and improvements and adding these amounts to the secured debt. This theory of liability is based on from the bank's communications to the receiver arising from judicial proceedings, the court-ordered receivership. (See *infra*.) "For purposes of anti-SLAPP analysis . . . an alleged act is incidental to a claim, and incidental

17

to any unprotected activity on which the claim is based, only if the act is not alleged to be the basis for liability." (*Wallace v. McCubbin*, *supra*, 196 Cal.App.4th at p. 1183.) In essence, Downtown Sunnyvale claims that Wells Fargo breached the contract when it engaged in protected activity. These allegations are not merely incidental.

We recognize that we must distinguish between speech and petitioning activity that provides *evidence* of liability and liability that is based on protected speech and petitioning activity. (*Graffiti*, *supra*, 181 Cal.App.4th at pp. 1214-1215.) For example, "[p]relitigation communications . . . may provide evidentiary support for the complaint without being a basis of liability. An anti-SLAPP motion should be granted if liability is based on speech or petitioning activity itself." (*Id*. at p. 1215.) Here, it is apparent that Downtown Sunnyvale's claim of liability is based, at least in part, on Wells Fargo's protected speech. These acts do not provide only evidence of liability.

Additionally, we acknowledge and agree with Downtown Sunnyvale's claim that "the sequence in which actions are filed is not determinative of whether a lawsuit is a prohibited suit. The mere fact that a lawsuit was filed after the defendant engaged in protected activity does not establish the complaint *arose from* protected activity under a statute because a cause of action may be triggered by protected activity without arising from it." (*Optional Capital*, *Inc*. *v*. *DAS Corp.* (2014) 222 Cal.App.4th 1388, 1399.) Downtown Sunnyvale's complaint was not only triggered by the protected activity; the principal gravamen of its complaint targets protected speech under the anti-SLAPP law.

For the foregoing reasons, this claim is subject to a special motion to strike. The trial court erred in concluding otherwise.[8]

---

[8] Since we conclude that all five causes of action arise from protected activity-- communication in connection with a judicial proceeding--we need not address Wells Fargo's alternative argument that the causes of action are subject to the anti-SLAPP statute because they are conduct in connection with an issue of public interest.

18

### 4. Commercial Speech Exemption

Downtown Sunnyvale, joined by the California Anti-SLAPP Project and Consumer Attorneys of California[9] as amici curiae, maintains that its amended complaint meets the required elements of the commercial speech exemption and is therefore not subject to the anti-SLAPP law even if the complaint arises from protected activity. We find the commercial speech exception inapplicable.[10]

*Amici Curiae's Request for Judicial Notice*

First, we address amici curiae California Anti-SLAPP Project's request for judicial notice. Amici curiae seek to introduce some of the legislative history behind section 425.17, which codifies the exemptions to the anti-SLAPP law, a screenshot of Wells Fargo's Web site stating the bank earned proceeds from sales of foreclosed properties, and several pages from Wells Fargo's financial reports that state its proceeds from sales of foreclosed properties. Wells Fargo opposes this motion.

Evidence Code section 452, subdivision (c) provides that judicial notice may be taken of "[o]fficial acts of the legislative, executive, and judicial departments of the United States and of any state of the United States." Our decision is based, in part, on the legislative history of the commercial speech exemption. Therefore, we grant judicial notice of the legislative history of section 425.17.[11]

---

[9] Consumer Attorneys of California, Privacy Rights Clearinghouse, Consumer Federation of California, and the Santa Clara County Trial Lawyers Association have filed a joint amici curiae brief.

[10] In its reply brief, Wells Fargo insists that since Downtown Sunnyvale did not raise the commercial speech exemption argument in its first complaint filed about the allegedly improper receiver sale, it cannot raise this argument here on appeal. However, even if Downtown Sunnyvale was precluded from raising this argument on appeal, we find the exemption inapplicable for the reasons set forth below.

[11] Wells Fargo opposes amici curiae's request for judicial notice of the legislative history of section 425.17, arguing that it is irrelevant to our analysis since the wording of the statute is clear. However, when interpreting a statute we may disregard "even plain (continued)

19

However, we deny amici curiae's request for judicial notice of the documents pertaining to Wells Fargo's business operations.  Evidence Code section 452, subdivision (h) states in pertinent part that judicial notice may be taken of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."  However, "[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court.  Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' " (*Vons Companies*, *Inc*. *v*. *Seabest Foods*, *Inc*. (1996) 14 Cal.4th 434, 444, fn. 3.)  This prevents any unfairness that may follow from one party seeking to raise an issue or argument that was not first argued at the trial court level. (*People v*. *Hamilton* (1986) 191 Cal.App.3d Supp. 13, 22.)  The materials amici curiae seek to introduce were not part of the record before the trial court, and there does not appear to be an exceptional circumstance that would encourage us to deviate from this general rule.

*Overview of the Commercial Speech Exemption*

The Legislature enacted section 425.17, which sets forth certain statutory exemptions to the anti-SLAPP statute, in response to the "disturbing abuse of Section 425.16, the California Anti-SLAPP Law."  (§ 425.17, subd. (a).)

One of the exemptions set forth in section 425.17 is for commercial speech.  This exemption provides that "[s]ection 425.16 does not apply to any cause of action brought

---

language which leads to absurd results or contravenes clear evidence of a contrary legislative intent." (*Ornelas v*. *Randolph* (1993) 4 Cal.4th 1095, 1105.)  Amici curiae claim that the legislative intent behind the commercial speech exemption requires us to interpret the exemption to apply to the type of speech and conduct at issue here. Therefore, we find the legislative history of the exemption relevant to both our discussion and decision.

against a person primarily engaged in the business of selling or leasing goods or services, including, but not limited to, insurance, securities, or financial instruments, arising from any statement or conduct by that person if both of the following conditions exist: [¶] (1) The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods, or services, that is made for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services, or the statement or conduct was made in the course of delivering the person's goods or services. [¶] (2) The intended audience is an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual or potential buyer or customer, or the statement or conduct arose out of or within the context of a regulatory approval process, proceeding, or investigation, except where the statement or conduct was made by a telephone corporation in the course of a proceeding before the California Public Utilities Commission and is the subject of a lawsuit brought by a competitor, notwithstanding that the conduct or statement concerns an important public issue." (§ 425.17, subd. (c).)

Our Supreme Court has interpreted section 425.17, subdivision (c) "to exempt from the anti-SLAPP law a cause of action arising from commercial speech when (1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting, or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience for the statement or conduct meets the definition set forth in section 425.17[, subdivision] (c)(2)." (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 30 (*Simpson*).)

21

Whether the commercial speech exemption codified in section 425.17, subdivision (c) applies is subject to a de novo standard of review. (*All One God Faith*, *Inc*. *v*. *Organic & Sustainable Industry Standards*, *Inc*. (2010) 183 Cal.App.4th 1186, 1211.) As a matter of statutory construction, " '[o]ur primary task . . . is to determine the Legislature's intent. [Citation.] Where possible, "we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . ." [Citation.]' [Citation.] Generally, exceptions to a statute are construed narrowly to cover 'only those circumstances which are within the words and reason of the exception.' [Citations.] ' "The literal meaning of the words of a statute may be disregarded to avoid absurd results or to give effect to manifest purposes that, in the light of the statute's legislative history, appear from its provisions considered as a whole." ' " (*Id*. at p. 1212.) "Plaintiffs have the burden to demonstrate the anti-SLAPP motion is exempt under section 425.17." (*Rivera v*. *First DataBank*, *Inc*. (2010) 187 Cal.App.4th 709, 717.)

*Application of the Commercial Speech Exemption*

In this case, the acts alleged as the basis of Downtown Sunnyvale's complaint, such as the bank's speech and conduct related to the funding of the court-appointed receiver, the receiver's actions leading up to the failed receiver's sale and the subsequent trustee's sale, and Wells Fargo's failure to inform potential bidders of the impending trustee's sale and its failure to notice a new default, are related to the bank's business operations as a secured lender. However, these acts are not the type of speech typically subject to the commercial speech exemption, which courts have described as "aimed squarely at false advertising claims." (*Demetriades v*. *Yelp*, *Inc*. (2014) 228 Cal.App.4th 294, 309.) There is no false advertising alleged here.

Undeterred, Downtown Sunnyvale insists the commercial speech exemption applies, relying on *Brill Media Co*., *LLC v*. *TCW Group*, *Inc*. (2005) 132 Cal.App.4th 324 (*Brill*), disapproved of in *Simpson*, *supra*, 49 Cal.4th 12. The plaintiffs in *Brill* were

22

comprised of several media companies that filed a complaint against a financial services company, arguing the financial services company had incentive to cause a default on the bonds issued by Brill. (*Brill*, *supra*, at p. 333.) The plaintiffs initiated the lawsuit after the filing of an involuntary bankruptcy petition, an act that is typically considered protected speech and petitioning activity under section 425.16. (*Brill*, *supra*, at p. 336; *Zamous v. Stroud* (2004) 32 Cal.4th 958, 964-965.)

*Brill* first determined that the defendant who filed the anti-SLAPP motion had the burden as part of the first prong of the anti-SLAPP law (demonstrating that the complaint arose out of protected activity), to also show that the complaint did not arise out of *exempted* activity as provided under section 425.17. (*Brill*, *supra*, 132 Cal.App.4th at pp. 330-331.) It further concluded that the required elements of the commercial speech exemption were met: (1) the defendants were primarily engaged in selling securities and financial instruments, (2) the challenged statements were made by the defendants in the course of delivering their goods and services, and (3) the statements were made to potential buyers of the media company's radio stations. (*Id*. at pp. 341-342.)

*Brill* noted that an "additional point warrant[ed] emphasis"--namely, that "section 425.17 was intended to apply to commercial disputes" such as the one involving Brill. (*Brill*, *supra*, 132 Cal.App.4th at p. 342.) In so concluding, the court examined the legislative history of the exception and cited to the Senate Judiciary Committee report prepared for then Senate Bill No. 515, which states " '[Senate Bill No.] 515 would make SLAPP motion[s] inapplicable to cases against a business where [the] cause of action arises from the business's commercial speech or activity.' (Sen. Com. On Judiciary, Rep. on Sen. Bill No. 515 (2003-2004 Reg. Sess.) as amended on May 1, 2003, p. 8; original underscoring.)" (*Brill*, *supra*, at p. 342.) The appellate court thereafter concluded that the defendants had failed to meet their burden under the first prong of the anti-SLAPP

23

law to show the cause of action arose from protected speech and petitioning activity since the commercial speech exemption applied. (*Ibid*.)

First, we note that *Brill*'s preliminary conclusion that the burden of proof is on the *defendant* bringing an anti-SLAPP motion to show that protected speech or conduct is not exempted under section 425.17 was disapproved of by the Supreme Court in *Simpson*, *supra*, 49 Cal.4th 12. *Simpson* held that the burden of proof falls to the party seeking the benefit--the plaintiff. (*Id*. at p. 26.)

Second, *Brill* did not interpret the commercial speech exemption as having a content restriction. (*Brill*, *supra*, 132 Cal.App.4th at pp. 340-342.) Therefore, when applying the commercial speech exemption to the facts before it, the *Brill* court did not consider whether the speech or conduct at issue--the filing of the bankruptcy petition-- was a representation of fact about that person's or a business competitor's business operations, goods, or services.

In fact, given the settled interpretation of the commercial speech exemption, we find it inapplicable. Downtown Sunnyvale does not meet its burden to demonstrate a crucial element of the commercial speech exemption: that the speech or conduct at issue consists of representations of fact concerning that person's or a business competitor's business operations. (§ 425.17, subd. (c)(1).)

Downtown Sunnyvale claims it met this requirement, because it alleges liability based on "Wells [Fargo's] conduct that effectively conveyed forceful representations of fact about its secured lending operations and services." However, its opening brief does not identify specific acts or statements. Instead, Downtown Sunnyvale makes only vague generalizations regarding the speech it contends must be exempted.[12]

_____

[12] For example, Downtown Sunnyvale alleges that Wells Fargo's funding of the receiver and failure to notify potential bidders of the trustee's sale fall within the commercial speech exemption.

It is true that the conduct alleged in the complaint deals with Wells Fargo's business operations. But interpreting these acts to be representations of facts within the meaning of section 425.17, subdivision (c)(1) would eviscerate the commercial speech exemption's content requirement. Amici curiae claim, for example, that Wells Fargo's execution of a lease term with Apple was a representation of fact that Wells Fargo had the right to engage in such transactions. If we were to accept this reasoning, any act or conduct by a business could be seen as a representation of fact that the business believes it has the right to engage in such an act. This characterization, though creative, leads to an impermissible expansion of the scope of the commercial speech exemption, which we do not believe is supported by its legislative history and the language of the statute itself.

The first draft of the bill codifying the exemption had the same expansive view that amici curiae seek to adopt here. Originally, the bill sought to exempt from the anti-SLAPP law "[a]ny cause of action against any manufacturer, wholesaler, retailer, or other entity involved in the stream of commerce, arising from any statement, representation, conduct, label, advertising, or other communication, made in regard to the product, services, or business operations of that person or entity, or any competitor." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1651 (2001-2002 Reg. Sess.) as amended May 7, 2002, p. 3.) The senate committee's analysis of the bill recognized the broad nature of the exemption as drafted, stating that "[o]n a policy level, the failure of the proposed statute to distinguish between conduct that may well fall within the paradigm of a SLAPP, as opposed to simple commercial speech intended to further the speaker's business interest is . . . troubling," and that "[t]he potential over-inclusiveness of the proposed exclusion may indeed raise both constitutional and policy concerns." (*Id*. at p. 12.)

The over-inclusive nature of the first iteration of the commercial speech exemption was clearly rejected by the Legislature when it passed Senate Bill No. 515,

25

which enacted the exemption.[13]  The analysis of the bill noted that the Consumer Attorneys of America, sponsors of the bill, asserted that "[SB 515] is a more measured approach than that considered by this Committee last year in SB 1651.  That bill proposed a wholesale exclusion of defendants who were product sellers from the anti-SLAPP law.  The failure of that proposal to distinguish between conduct that may well fall within the paradigm of a SLAPP, as opposed to simple commercial speech intended to further the speaker's business interest, was also troubling. [¶] Thus, the proposal was recrafted to take a different tack and instead looks at the conduct and context of the statement in order to determine if the underlying statement should be protected by the anti-SLAPP law."  (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003-2004 Reg. Sess.) as amended May 1, 2003, p. 11.)

It is apparent from the legislative history of section 425.17 and the cases interpreting it that the commercial speech exemption should not be applied as broadly as proposed by amici curiae and Downtown Sunnyvale.  The Legislature intended to target a specific subset of commercial speech that believed should not be protected under the anti-SLAPP law.  That is why the exemption contains a clear content restriction, applying only if the statement is a representation of fact about that business' goods or services, or a competitor's goods and services.  The statements and conduct at issue here simply do not meet this requirement.

Downtown Sunnyvale's claims also suffer from a persistent flaw:  a failure to parse out the purportedly exempted statements and sufficiently demonstrate *all* of them meet the requirements of section 425.17, subdivision (c)(1).  In its brief, Downtown

---

[13] Prior to the passage of Senate Bill No. 515, another version of the commercial speech exception was introduced as Senate Bill No. 789, which revised Senate Bill No. 1651.  (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 789 (2001-2002 Reg. Sess.) as amended Aug. 28, 2002, p. 6.)

Sunnyvale lists through several acts and statements that it insists "effectively conveyed forceful representations of fact about [Wells Fargo's] secured lending operations and services." However, Wells Fargo's communications with the receiver to fund its court-authorized expenditures and its negotiations of various settlement agreements are *not* representations of fact concerning its business operations. Neither was the "intended audience" of these statements an "actual or potential buyer or customer" of Wells Fargo's goods or services as required under section 425.17, subdivision (c)(1).

The other arguments advanced by amici curiae are similarly unpersuasive. Finding the exemption inapplicable here does not mean that large financial institutions such as Wells Fargo will be able to evade litigation that may arise from its secured lending business. If a plaintiff meets the relatively low standard of demonstrating a probability of prevailing on the merits on their claims under the second prong of the anti-SLAPP law, the action will not be dismissed.

5. **Probability of Prevailing on the Merits**

Since we have determined all of the causes of action in the second amended complaint are subject to the anti-SLAPP statute, we must next examine if Downtown Sunnyvale has met its burden to demonstrate a probability of prevailing on any of its claims.

"To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish

27

evidentiary support for the claim.' [Citation.] In making this assessment, it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .' [Citation.] The plaintiff need only establish that his or her claim has 'minimal merit.' " (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 291.) To defeat an anti-SLAPP motion, the plaintiff needs only to demonstrate a probability of prevailing on " '*any part*' " of the cause of action. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

*First Cause of Action*: *Set Aside of the Trustee's Sale*

Downtown Sunnyvale's first cause of action to set aside the trustee's sale alleged that Wells Fargo illegally chilled bidding in violation of Civil Code section 2924h, subdivision (g).

In its opposition to the anti-SLAPP motion below, Downtown Sunnyvale's sole argument, comprised of one paragraph, asserted the following: "As set forth in the Factual Background section, *infra*, and accompanying evidence, DSMU have made a prima facie showing of standing, authority, and improprieties in the Trustee Sale, enumerating Wells Fargo's acts to block DSMU's redemption of the Loan prior to foreclosure and chill any potential competitive bidding at the Trustee sale." Downtown Sunnyvale made no other attempt to develop this argument or provide any legal analysis.

On appeal, Downtown Sunnyvale attempts to expand its argument that it has a probability of prevailing. Many of these arguments were not raised in its opposition to the anti-SLAPP motion. As a general rule, "[p]oints not raised in the trial court will not be considered on appeal." (*Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486.) Wells Fargo urges us not to consider these additional claims. However, we have the discretion to consider matters not raised below to the trial court on their merits if doing so does not require resolution of a factual dispute. (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6.) Assuming without deciding that Downtown

28

Sunnyvale has not waived its arguments, we would nonetheless conclude it failed to demonstrate a probability of prevailing on the merits.

As Downtown Sunnyvale opines in its opening brief, "[c]ase law instructs that the elements of an equitable cause of action to set aside a foreclosure sale are: (1) the trustee or mortgagee caused an illegal, fraudulent, or willfully oppressive sale of real property pursuant to a power of sale in a mortgage or deed of trust; (2) the party attacking the sale (usually but not always the trustor or mortgagor) was prejudiced or harmed; and (3) in cases where the trustor or mortgagor challenges the sale, the trustor or mortgagor tendered the amount of the secured indebtedness or was excused from tendering." (*Lona v. Citibank*, *N.A.* (2011) 202 Cal.App.4th 89, 104.)

Generally, "[a] trustee's sale under a deed of trust is presumed to be valid." (*Sierra-Bay Fed. Land Bank Assn. v. Superior Court* (1991) 227 Cal.App.3d 318, 337.) However, a "debtor may apply to a court of equity to set aside a trust deed foreclosure. [Citation.] But in order to support such a request the debtor must allege such unfairness or irregularity that, when coupled with the inadequacy of price obtained at the sale, it is appropriate to invalidate the sale." (*Ibid*.)

Downtown Sunnyvale has failed to demonstrate the existence of errors that impermissibly restrained or chilled bidding in violation of section 2924h, subdivision (g), which makes it unlawful for a person, either acting alone or in concert with others, to fix or restrain bidding at a sale of property pursuant to a power of sale in a deed of trust or mortgage.[14]

---

[14] Wells Fargo argues that Downtown Sunnyvale has not provided evidence of prejudice, because SHP and Pau failed to tender a redemption. (See *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 578.) However, we need not determine whether SHP and Pau were required to make a tender. Even if no tender was required, or if Downtown Sunnyvale met the tender requirement, it has still failed to demonstrate it was prejudiced by the bank's actions for the reasons we explain below.

Courts have invalidated unfairly or unlawfully conducted foreclosure sales in cases where purchasers or sellers took proactive steps to thwart the competitive process. For example, in *Lo v. Jensen* (2001) 88 Cal.App.4th 1093, the Second District affirmed the trial court's order setting aside a nonjudicial foreclosure sale. *Lo* involved two buyers who colluded together to purchase a condo for $5,412. (*Id.* at p. 1095.) The buyers had initially planned to bid $100,000 on the condo, which they valued to be worth at least $150,000. (*Ibid.*)

*South Bay Building Enterprises, Inc. v. Riviera Lend-Lease, Inc.* (1999) 72 Cal.App.4th 1111 also involved a sale where key players proactively restrained bidding. There, a junior lienholder appealed after the trial court denied its motion to amend its complaint and granted the senior lienholder's motion for a directed verdict. (*Id.* at p. 1120.) The junior lienholder alleged that the senior lienholder and the trustee of the foreclosed property had entered into an agreement for the senior lienholder to purchase the property. The trustee delayed the foreclosure sale several times when another bidder was present and misrepresented the amount of the senior lienholder's interest in the secured property. (*Id.* at pp. 1116-1118.)

In sharp contrast to the aforementioned cases, Downtown Sunnyvale does not submit any evidence indicating Wells Fargo colluded with the trustee to restrain or fix bidding. Instead, Downtown Sunnyvale characterizes the bidding process as prejudicially unfair, because Wells Fargo did not notify bidders who participated in the receiver sale process about the upcoming trustee's sale. Downtown Sunnyvale also alleges Wells Fargo did not inform bidders that the agreement with Starwood no longer applied, and the contract with Starwood remained open even after the trustee's sale. This, according to Downtown Sunnyvale, created "uncertainty" with serious bidders, who would have had reservations about the outcome of the trustee's sale given the appearance of an outstanding deal with Starwood. Downtown Sunnyvale further speculates that this

30

uncertainty negated any possibility that Starwood would have come to bid on the property during the trustee's sale, because it may have erroneously believed it still retained rights to the Project.

These arguments appear to suggest ways in which Wells Fargo could have generated more interest in the trustee's sale. However, even if we assume that Downtown Sunnyvale's allegations are true, these allegations are not evidence that the bank restrained or chilled bidding, or otherwise failed to follow the statutory procedures required to complete a lawful trustee's sale.

Under California law, "[u]pon default by the trustor, the beneficiary may declare a default and proceed with a nonjudicial foreclosure sale. (Civ. Code, § 2924; [citation].) The foreclosure process is commenced by the recording of a notice of default and election to sell by the trustee. (Civ. Code, § 2924; [citation].) After the notice of default is recorded, the trustee must wait three calendar months before proceeding with the sale. (Civ. Code, § 2924, subd. (b); [citation].) After the 3-month period has elapsed, a notice of sale must be published, posted and mailed 20 days before the sale and recorded 14 days before the sale. (Civ. Code, § 2924f; [citation].) The trustee may postpone the sale at any time before the sale is completed. (Civ. Code, § 2924g, subd. (c)(1); [citation].) If the sale is postponed, the requisite notices must be given. (Civ. Code, § 2924g, subd. (d).) The conduct of the sale, including any postponements, is governed by Civil Code section 2924g. [Citation.] The property must be sold at public auction to the highest bidder. (Civ. Code, § 2924g, subd. (a); [citation].)" (*Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830.)

Wells Fargo filed a notice of default more than three months before the notice of sale was recorded, a fact that Downtown Sunnyvale does not dispute. Procedurally, the bank was not required to do anything else. Yet Downtown Sunnyvale faults the bank for its failure to go beyond its legal obligations--failing to notify the rejected bidders from

31

the receiver sale of the impending trustee's sale. There is no evidence Wells Fargo restrained or chilled bidding.

More importantly, whether the bank's failure to personally notify bidders from the receiver's sale about the trustee's sale contributed to the absence of bidders at the trustee's sale is purely speculative. Downtown Sunnyvale has not submitted evidence to show there was a viable bidder who was ready, willing, and able to bid at the trustee's sale, but failed to do so because of Wells Fargo's alleged improprieties. Accordingly, it has failed to provide evidence that it was prejudiced or harmed by the bank's actions, an element that is required to set aside a trustee's sale.

Instead, Downtown Sunnyvale insists the number of interested buyers during the receiver sale process is evidence that there must have been multiple parties interested in the Project during the trustee's sale process. This inference has no support in the record. "[D]eclarations that lack foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory are to be disregarded." (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 26.) That there were multiple buyers interested in the Project during the receiver sale process is not evidence that there would have been bidders interested in purchasing the property at the trustee's sale.[15]

Similarly, we must also reject Downtown Sunnyvale's claim that Starwood would have bid at the trustee's sale had it not possessed a mistaken belief that it had contractual

---

[15] Courts have held that "the proper inquiry in the context of an anti-SLAPP motion 'is whether the plaintiff proffers sufficient evidence for such an inference.' " (*Oasis West Realty, LLC v. Goldman, supra*, 51 Cal.4th at p. 822.) Therefore, a reviewing court "must consider not only facts supported by direct evidence, but also facts that reasonably can be inferred from the evidence." (*Ulkarim v. Westfield LLC* (2014) 227 Cal.App.4th 1266, 1274.) However, Downtown Sunnyvale has not offered sufficient evidence to support the inference that the lack of bidders at the trustee's sale was due to Wells Fargo's failure to notify the previous bidders from the receiver sale process. As Wells Fargo noted, it published the trustee's sale in several newspapers.

rights to the Project. First, this argument is speculative and without support. (*Gilbert v. Sykes*, *supra*, 147 Cal.App.4th at p. 26.) Second, Downtown Sunnyvale does not clearly articulate what it expected Wells Fargo to do in this situation. The contract between Starwood and the receiver was just that: a contract between the *Starwood* and *the receiver*. Wells Fargo was not a party to the contract, and it could not have repudiated it.

Downtown Sunnyvale's argument that Wells Fargo "clogged the equity of redemption and otherwise interfered with [its] rights of redemption" by " 'piling on' two years' worth of unauthorized improvement and development costs, unnecessary and excessive carrying costs, unauthorized junior lien payments" and adding it to the debt in violation of the deed of trust is also without merit. As we determined in *Downtown Sunnyvale II*, the receiver acted within his appointment powers when he signed leases and made improvements to the Project. (*Downtown Sunnyvale II*, *supra*, H038572, H039024.) The receiver, acting as an agent of the court, obtained court approval confirming many of its major actions, including the work related to signing a lease with Nokia. Wells Fargo's funding of the receiver's activities were, as a result, part and parcel of the court-approved receivership. Downtown Sunnyvale has failed to show the actions taken by the receiver were unauthorized or that Wells Fargo's advancements to the receiver were somehow inappropriate.

Downtown Sunnyvale has also failed to show that Wells Fargo violated section 726.[16] In its amended complaint, Downtown Sunnyvale alleged the bank violated section

---

[16] In its reply brief, Wells Fargo argues that Downtown Sunnyvale is precluded from litigating this point, because it was raised and decided in *Downtown Sunnyvale I*. We agree in part. To the extent Downtown Sunnyvale claims a violation of section 726 based on the *same* actions taken by Wells Fargo and supported by the same evidence as litigated in *Downtown Sunnyvale I*, *Downtown Sunnyvale I* is law of the case. However, to the extent that Downtown Sunnyvale has advanced additional arguments, or has provided additional evidentiary support, these claims would not have been finally decided in the prior appeal. Therefore, Downtown Sunnyvale would not be precluded from (continued)

726 by failing to conduct a commercially reasonable trustee's sale, failing to make an even playing field for all potential bidders, and proceeding to a public auction even though the Project was encumbered by the contract with Starwood.

Section 726 provides that a beneficiary of a note or deed of trust for a real property seeking to collect the debt "can bring only one lawsuit to enforce its security interest and collect its debt." (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 997 (*Wozab*).) The secured creditor must proceed against the real property first; he cannot treat the debt as an ordinary debt and base an independent cause of action on it. (*Ibid*.) "[W]here the creditor sues on the obligation and seeks a personal money judgment against the debtor without seeking therein foreclosure of such mortgage or deed of trust, he makes an election of remedies, electing the single remedy of a personal action, and thereby waives his right to foreclose on the security to or sell the security under a power of sale." (*Walker v. Community Bank* (1974) 10 Cal.3d 729, 733.) Thus, section 726 has a dual application. A debtor can raise it as an affirmative defense in an action on the promissory note, forcing the creditor to proceed against the security, or he may invoke it as a sanction against the creditor on the basis that the creditor, by not foreclosing first on the security, has waived his right to do so. (*Wozab*, *supra*, at p. 997.)

Downtown Sunnyvale has not provided any evidence that would demonstrate a probability of prevailing on its claims that Wells Fargo violated section 726 either by breaching the one form of action rule or the security first rule. Wells Fargo filed a complaint seeking judicial foreclosure, which is permitted under section 726. The judicial foreclosure did not proceed to a judgment and while that action was pending Wells Fargo entered into a settlement agreement with the Borrowers where the property

litigating those claims. Regardless, even if Downtown Sunnyvale were not precluded from relitigating its section 726 arguments, we would find that it has failed to demonstrate a probability of prevailing.

34

could be sold via a nonjudicial foreclosure process.  At all times, there was only *one* action brought, and Wells Fargo did not seek to appropriate assets before exhausting the security first.

Downtown Sunnyvale also argues that Wells Fargo blocked its efforts to redeem the loan.  Downtown Sunnyvale asserts that Pau and SHP tendered a redemption to Wells Fargo in November 2010 and to the receiver in April 2011.  However, it claims that these attempts at redemption were ignored.

A borrower can redeem property from foreclosure prior to a foreclosure sale by exercising the equitable right to redemption.  (*Knapp v*. *Doherty* (2004) 123 Cal.App.4th 76, 87.)  A tender is an offer of performance made with the intent to extinguish an obligation, in this case, the debt owed.  (Civ. Code, § 1485.)  "As a general rule, the debtor in a nonjudicial foreclosure may avoid the loss of the property by 'pay[ing] all amounts due at any time prior to the sale . . . .' " (*Multani v*. *Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1444-1445.)  Typically, a credible offer to tender the full amount of indebtedness by a borrower is required to set aside a foreclosure sale under a deed of trust.  (*Gaffney v*. *Downey Savings & Loan Assn*. (1988) 200 Cal.App.3d 1154, 1165.)

First, Pau and SHP's attempt to purchase the property in November 2010 was not a redemption.  That is, Pau and SHP did not make a credible offer to pay the *full amount* of the indebtedness.  In its letter to Wells Fargo, SHP requested that it be given the right to be selected as the buyer by matching the "best bona fide offer" submitted to purchase the Project with a premium of 1 percent.  This is not a credible offer to purchase the property by tendering the amount of indebtedness owed.  It is unclear what the market price for the Project was at that time, and if this price would have covered the amount of the debt.

In its April 2011 letter, SHP and Pau made an offer to pay $100,000 above the best bona fide offer made to the receiver and not less than $185 million.  This purchase offer

was not framed as a redemption, which is an equitable right that may be exercised by the borrowers to reclaim a property under foreclosure. (*Gaffney v. Downey Savings & Loan Assn.*, *supra*, 200 Cal.App.3d at p. 1165.) Based on the wording of the offer letter, it was not clear whether SHP and Pau sought to redeem the property as borrowers, or sought to purchase the property as interested third party developers of the Project who possessed a vested stake in the Project.

The issue of Pau and SHP's managerial authority over the borrowers was a contested issue in the proceedings below. The existence of this dispute was underscored in Wells Fargo's letter in August 2011 to Pau and SHP specifying some of the terms of redemption. The terms included a condition that Wells Fargo's discussions with Pau and SHP regarding the repayment of the loan would not be interpreted as waiver of any argument that Pau and SHP were not in control of the borrowers and a condition that Wells Fargo reserved the right to evaluate RREEF's response to the potential repayment and to conduct its own research before committing to a repayment. In its reply brief, Downtown Sunnyvale claims the April 2011 offer letter was made by SHP as the "Borrowers' manager after RREEF's removal in July 2009." However, there is no evidence indicating this was the case. Neither does this conclusory statement acknowledge the very real dispute over who had authority to act on the Borrower's behalf.

Downtown Sunnyvale argues that irrespective of whether it had control over the Borrowers, SHP and Pau retained a right to redeem the loan because it was an interested third party. We disagree. The case law establishes that *borrowers* in default are the ones who may tender a redemption in order to retain a property in the process of foreclosure. The case relied on by Downtown Sunnyvale, *O'Neil v. General Security Corp.* (1992) 4 Cal.App.4th 587, 600-601, has nothing to do with the right of redemption. *O'Neil* concluded that the "sanction aspect of section 726 operates for the benefit of both the

36

primary debtor and third parties claiming an interest in the property, whether as successors-in-interest or third party lienholders." (*Id*. at p. 600.) *O'Neil* is not relevant to the issues raised by the parties here.

Additionally, it does not appear that SHP and Pau's offer of $185 million would have covered the full amount of the indebtedness owed, which Wells Fargo estimated at $189,418,440. The bank's August 2011 letter expressly stated that it would consider the loan repaid if SHP and Pau submitted $189,418,440 prior to the trustee's sale. However, neither SHP, Pau, or RREEF (i.e., none of the borrowers) submitted payment to Wells Fargo to redeem the loan amount. This letter did not condition redemption on a determination of who was in control of the Borrowers. Wells Fargo simply cautioned SHP and Pau that acceptance of the tender should not be taken as the bank's acknowledgement that SHP and Pau had authority over the Borrowers, since that was a contested issue. Based on the foregoing, there is no evidence Wells Fargo blocked or ignored SHP and Pau's attempts to redeem.

Therefore, we find that for the reasons set forth above, Downtown Sunnyvale has not met its burden to demonstrate a probability of prevailing on its cause of action to set aside the trustee's sale. Accordingly, the trial court did not err in striking this cause of action.

*The Second through Fourth Causes of Action*

Downtown Sunnyvale's second through fourth causes of action (cancellation of the trustee's deed, slander of title, and an accounting) are all derivative of the allegations set forth in his first cause of action to set aside the trustee's sale. Since we conclude Downtown Sunnyvale has failed to demonstrate a probability of prevailing on the first cause of action, we must also find that it has failed to demonstrate a probability of prevailing on the second, third, and fourth causes of action.

37

*The Fifth Cause of Action*:  *Breach of Contract*

Lastly, we must determine if Downtown Sunnyvale met its burden to demonstrate it had a probability of prevailing on its last cause of action for breach of contract and breach of the implied covenant of good faith and fair dealing.[17]

The elements of a breach of contract consists of:  (1) a contract, (2) a plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) resulting damages.  (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1388.)  The complaint alleged that the parties had entered into a contract (the deed of trust) and that Downtown Sunnyvale had done all of what it was required to do in the event of a default under the deed of trust.  The complaint further alleged Downtown Sunnyvale breached the deed of trust by helping itself to improper remedies, characterized as (1) artificially inflating the debt through unauthorized development and improvement charges, unnecessary and excessive carrying costs, and unauthorized junior lien payments, (2) precluding competitive bidding at the trustee's sale by improperly inflating the debt and failing to notice the default after the court's order halting the receiver's sale, and (3) rejecting the borrowers' attempt at redemption.  The amended

---

[17] Because the trial court found that this cause of action did not arise from protected activity, it did not reach the second prong of the anti-SLAPP analysis and did not make a ruling on whether Downtown Sunnyvale had established a probability of prevailing on the merits of its breach of contract claim.  However, we review an order denying an anti-SLAPP motion de novo, so we may determine, if the record is sufficient, whether Downtown Sunnyvale has met its burden in the second prong since the issues involved are matters of law.  (See, e.g., *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90.)  We conclude the record is sufficient for us to make a determination on whether Downtown Sunnyvale met its burden on the second prong with respect to its breach of contract claim.  Downtown Sunnyvale does not seek to introduce any other evidence that would require a factual determination and instead relies on the materials submitted to the trial court below.  Remand would therefore be a waste of judicial resources, as we are in as good of a position as the trial court to determine whether the second prong has been satisfied.

38

complaint asserted that Wells Fargo had breached the covenant of good faith and fair dealing and alleged damages in its loss of fee ownership of the Project and loss of equity.

For the same reasons Downtown Sunnyvale has failed to demonstrate a probability of prevailing on its first four causes of action, it has failed to meet its burden to demonstrate a probability of prevailing on its breach of contract claim and its claim that Wells Fargo violated the implied covenant of good faith and fair dealing.

First, the complaint fails to identify what contractual obligations Wells Fargo breached. The complaint merely alleges Wells Fargo breached the deed of trust by committing various improper acts. There is nothing in the complaint that discusses how these acts breached specific provisions in the deed of trust.

Additionally, in its cross-respondent's reply brief, Downtown Sunnyvale spends approximately two pages on the key argument that it demonstrated a probability of prevailing, asserting that "the prima facie validity of the [breach of contract] claim is highlighted by the same evidentiary showing" it relies on its discussion of the first four causes of action. There is no discussion of the elements required for establishing a breach of contract or a violation of the implied covenant of good faith and fair dealing. " '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived and pass it without consideration.' [Citation.] [¶] It is the duty of appellants' counsel, not of the courts, 'by argument and the citation of authorities to show that the claimed error exists.' " (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1050.)

However, Downtown Sunnyvale insists in its cross-respondent's reply brief that it did identify specific provisions in the deed of trust that were breached in its opening brief on appeal and in its cross-respondent's reply brief, including the deed of trust provisions allowing Wells Fargo to add maintenance and preservation costs to the secured debt, but not allowing the addition of costs associated with the construction and completion of the

39

Project.  Even if we were to consider these bare allegations, we would still conclude Downtown Sunnyvale failed to provide evidence to show its breach of contract claim has even minimal merit.  Here, Wells Fargo's evidence supporting its motion to strike defeats Downtown Sunnyvale's attempt to establish any evidentiary support for its breach of contract claim.  (See *Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 291.)

The interpretation of a contract is a judicial function.  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107.)  The trial court " 'give[s] effect to the mutual intention of the parties as it existed' " at the time the contract was executed.  (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38, fn. 5.)  Ordinarily, the intent of the contracting parties is a legal question that is determined solely by examining the contract's terms.  (Civ. Code, §§ 1638, 1639.)

With respect to Downtown Sunnyvale's claims regarding the inflation of the debt, Wells Fargo points out that the deed of trust expressly allowed it, as the administrative agent, to pay sums including but not limited to those costs necessary for protection, maintenance, alterations, renovations, and repairs.  The deed of trust stated that "[a]ny amounts so paid shall bear interest at the default rate stated in the Loan Agreement and shall be secured by this Deed of Trust."  The deed of trust also stated that Wells Fargo would have the right to request appointment of a receiver from the court to manage, lease, and operate the Project.  We previously determined in *Downtown Sunnyvale II* that the receiver acted within the scope of his appointment order when he paid off certain liens and when he made improvements and developed the Project.  (See *Downtown Sunnyvale II*, *supra*, H038572, H039024.)  Pursuant to the appointment order, these amounts were added to the amount of the secured debt.  In *Downtown Sunnyvale II*, we also determined the receiver's appointment order did not retroactively expand the provisions of the deed of trust.  (*Ibid.*)  As a result, the evidence provided by Downtown Sunnyvale to support its claim that Wells Fargo breached the deed of trust by adding on

40

carrying costs, paying off junior liens, and developing and improving the Project--all actions taken by the court-appointed receiver--do not establish a breach.

Furthermore, Downtown Sunnyvale failed to provide evidence it was damaged by Wells Fargo's alleged breach, which is "a necessary element of the breach of contract cause of action." (*Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 775.) As we discussed before, there is no admissible evidence that there was a bidder who was willing and able to purchase the Project for more than Wells Fargo's credit bid at the trustee's sale.

Lastly, we have already addressed and rejected, in the previous section of our opinion discussing the first cause of action to set aside the trustee's sale, Downtown Sunnyvale's claims that Wells Fargo frustrated or blocked SHP and Pau's attempts at redemption and conducted restrained competitive bidding during the trustee's sale. There is no evidence, aside from Downtown Sunnyvale's conclusory assertions and speculations, to support these allegations. Therefore, Downtown Sunnyvale has also failed to show its theory that Wells Fargo breached the implied covenant of good faith and fair dealing has a probability of prevailing on the merits.

Since Downtown Sunnyvale fails to submit any other evidence to support its breach of contract theories, this last cause of action must be stricken.

6. **Motion for Anti-SLAPP Discovery**

Finally, Downtown Sunnyvale argues the trial court erred in denying its motion for anti-SLAPP discovery.

"Generally, discovery is closed once a motion to strike under section 425.16 has been filed. (§ 425.16, subd. (g).) However, the trial court may allow discovery limited to the issues raised by the motion to strike upon 'a timely and proper showing in response to the motion to strike.' (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 868.) The 'proper showing' includes 'good cause' for the requested

discovery. (§ 425.16, subd. (g).) 'We review for abuse of discretion as to the trial court's decision as to whether a plaintiff has complied with the requirements of section 425.16, subdivision (g) to merit discovery prior to a hearing on the motion to strike. [Citations.]' (*Tuchscher Development Enterprises*, *Inc*. *v*. *San Diego Unified Port Dist*. (2003) 106 Cal.App.4th 1219, 1247.)" (*Tutor-Saliba Corp*. *v*. *Herrera* (2006) 136 Cal.App.4th 604, 617.) A trial court abuses its discretion if its decision is arbitrary, capricious, or exceeds the bounds of all reason. (*Ibid*.)

Downtown Sunnyvale filed its motion for anti-SLAPP discovery on September 14, 2012, acknowledging that Wells Fargo's anti-SLAPP motion was set for a hearing in less than two weeks on September 27, 2012. Its discovery motion requested the opportunity to depose three Wells Fargo employees who were personally involved with the transactions related to the Project's deed of trust and asked that Wells Fargo produce "limited" documents in advance of these depositions.[18] Downtown Sunnyvale asserted this discovery was necessary because it may produce evidence to show it had made a prima facie case on the merits in order to survive Wells Fargo's anti-SLAPP motion.

On September 27, 2012, the court held a hearing on the pending anti-SLAPP motion. Downtown Sunnyvale reminded the court of its pending anti-SLAPP discovery motion. In response, the court questioned the request for discovery, stating: "You never indicated to me what is out there that's going to compel me to continue this [anti-SLAPP] motion in terms of what you're seeking discovery [*sic*]." On November 16, 2012, the

---

[18] In an attachment to the motion for anti-SLAPP discovery, Downtown Sunnyvale requested that Wells Fargo provide, for example, *all communications* between Wells Fargo and the Borrowers between January 1, 2009, and August 17, 2011, regarding the collateral for the Sunnyvale deed of trust, *all communications* between Wells Fargo and RREEF between the same dates regarding the collateral, and *all communications* between Wells Fargo and the receiver regarding the collateral for the deed of trust and the subject property.

42

trial court concluded this discovery motion was moot, because the ruling on the anti-SLAPP motion was pending.

We find the trial court did not abuse its discretion when it denied the motion for additional discovery. First, the discovery request and the opposition to the anti-SLAPP motion were at odds with one another. The discovery motion asserted that additional evidence was required in order for Downtown Sunnyvale to make a prima facie case. However, in its opposition to the anti-SLAPP motion, Downtown Sunnyvale's position was that the gravamen of its complaint did not arise out of protected petitioning activity. Additionally, the anti-SLAPP opposition claimed that even if the complaint *did* arise out of protected petitioning activity, Downtown Sunnyvale had met its burden to demonstrate a probability of prevailing on the merits of the complaint through the voluminous amount of evidence demonstrating Wells Fargo's wrongdoings.

Downtown Sunnyvale also did not show good cause existed for the court to grant its request for anti-SLAPP discovery. "Decisions that have considered what constitutes such a showing of good cause have described it as a showing 'that a defendant or witness possesses evidence needed by plaintiff to establish a prima facie case.' [Citation.] The showing should include some explanation of 'what additional facts [plaintiff] expects to uncover . . . .' " (*1-800 Contacts*, *Inc*. *v*. *Steinberg* (2003) 107 Cal.App.4th 568, 593.) During the hearing on the anti-SLAPP motion and in its motion for discovery, Downtown Sunnyvale did not clearly identify the specific information it sought to obtain, and it did not demonstrate the evidence could not be obtained by other means.

Much of the evidence that Downtown Sunnyvale sought in its discovery motion would have been duplicative of the information it already had in its possession. For example, Downtown Sunnyvale requested information pertaining to the receivership's costs. This information was obtained during the discovery process for the litigation

43

underlying *Downtown Sunnyvale II*, the case that concerned the discharge of the court-appointed receiver.

Downtown Sunnyvale also sought evidence regarding Wells Fargo's failure to affirmatively notify bidders of the trustee's sale.  Since Downtown Sunnyvale claims that Wells Fargo *did not* inform the bidders of the sale, there would have been nothing to discover.  Additionally, this information is not the type that could have only been obtained from Wells Fargo.  In order to demonstrate prejudice stemming from Wells Fargo's failure to act, Downtown Sunnyvale could have obtained a declaration from one of the bidders that it was ready, willing, and able to bid on the Project, but only failed to do so because it was not notified of the pending trustee's sale.  This information would not have been discovered by taking depositions of Wells Fargo's employees or by combing through Wells Fargo's communications regarding the sale.

Downtown Sunnyvale relies on *Lafayette Morehouse*, *Inc*. *v*. *Chronicle Publishing Co*., *supra*, 37 Cal.App.4th 855 for the proposition that courts should "liberally" exercise their discretion to allow anti-SLAPP discovery "when evidence to establish a prima facie case is reasonably shown to be held, or known, by defendant or its agents and employees." (*Id*. at p. 868.)  However, the dicta in *Lafayette Morehouse* has been superseded as the "decision 'predate[s] the 1997 amendment requiring a broad interpretation of section 425.16.' [Citation.]  Accordingly, we join the courts that have limited the reach of *Lafayette Morehouse*'s language." (*Paterno v. Superior Court* (2008) 163 Cal.App.4th 1342, 1351.)

Here, Downtown Sunnyvale did not specifically identify what facts it intended to discover, much of the evidence it sought was duplicative of items already in its possession, and it is not clear that the discovery sought was attainable only through Wells Fargo.  Furthermore, Downtown Sunnyvale's argument in its opposition to the anti-SLAPP motion was not that it required more evidence to establish a prima facie case on

44

the merits of its claims.  Rather, its position in the opposition and here on appeal is that it had provided *ample* evidence of wrongdoing that establishes a probability of prevailing on all of its causes of action.

Therefore, we conclude the trial court did not abuse its discretion in concluding that Downtown Sunnyvale did not satisfy its burden to demonstrate the existence of good cause in order to lift the discovery stay.

7. **Conclusion**

Wells Fargo has met its burden to show that all of the causes of action alleged in the amended complaint arise from protected petitioning activity.  However, Downtown Sunnyvale has failed to meet its burden to demonstrate a probability of prevailing on any of its claims.  Therefore, we must reverse the trial court's order denying Wells Fargo's anti-SLAPP motion on the fifth cause of action.

DISPOSITION

The order granting the anti-SLAPP motion in part and denying it in part is reversed.  The trial court is directed to enter a new order granting the anti-SLAPP motion on all five causes of action.  Wells Fargo is entitled to its costs on appeal.

 

                                                        _____

                                                                 Premo, J.

WE CONCUR:

_____
Rushing, P.J.

_____
Elia, J.